UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES B.,                              )
                                       )
                Plaintiff,             )
                                       )
        v.                             )        No.  4:19 CV 1763 JMB
                                       )
                                       )
ANDREW M. SAUL,                        )
Commissioner of Social                 )
Social Security Administration,        )
                                       )
                Defendant.             )

## MEMORANDUM AND ORDER

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, *et seq.* ("the Act").  The Act authorizes judicial review of the final decision of the Social Security Administration denying Plaintiff James B.'s ("Plaintiff") application for disability benefits under Title II of the Social Security Act,  see 42 U.S.C. §§ 401 et seq.  All matters are pending before the undersigned United States Magistrate Judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c).  Substantial evidence supports the Commissioner's decision, and therefore it is affirmed.  See 42 U.S.C. § 405(g).

## I.   Procedural History

On July 13, 2016, Plaintiff filed an application for disability benefits, arguing that his disability began on December 4, 2015, as a result of extreme pain in his feet and lower back, depression, anxiety, and fractured and degraded bones in his feet.  (Tr. 100)  On December 14, 2016, Plaintiff's claims were denied upon initial consideration.  (Tr. 100-04)  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  Plaintiff appeared at the hearing (with counsel) on July 24, 2018, and testified concerning the nature of his disability, his

functional limitations, and his past work.  (Tr. 35-85)  The ALJ also heard testimony from Dr. Jeffrey Magrowski, a vocational expert ("VE").  (Tr. 69-78, 255-58)  The VE opined as to Plaintiff's ability to perform his past relevant work and to secure other work in the national economy, based upon Plaintiff's functional limitations, age, and education.  (Id.)  After taking Plaintiff's testimony, considering the VE's testimony, and reviewing the rest of the evidence of record, the ALJ issued a decision on October 24, 2018, finding that Plaintiff was not disabled, and therefore denying benefits.  (Tr. 18-30)

Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration ("SSA").  (Tr. 1-6)  Plaintiff submitted additional opinion and medical evidence, which was not before the ALJ when she decided Plaintiff's case on October 24, 2018.[1] The Appeals Council did not consider the additional opinion and medical evidence, finding that it did not relate to the period at issue, December 4, 2015, through October 24, 2018.  On April 24, 2019, the Appeals Council denied review of Plaintiff's claims, making the October 24, 2018, decision of the ALJ the final decision of the Commissioner.  Plaintiff has therefore exhausted his administrative remedies, and his appeal is properly before this Court.  See 42 U.S.C. § 405(g).

In his brief to this Court, Plaintiff raises one issue, challenging the ALJ's evaluation of Dr. Margaret Shields' opinion evidence.  The Commissioner filed a detailed brief in opposition.

As explained below, the Court has considered the entire record in this matter.  Because the decision of the Commissioner is supported by substantial evidence, it will be affirmed.

## II.    **Medical Records**

The administrative record before this Court includes medical records concerning

---

[1] The additional evidence from Dr. Margaret Shields included opinion evidence dated December 17, 2018, and undated x-rays and pictures of Plaintiff's feet.

Plaintiff's health treatment from May 21, 2014, through June 21, 2018.  The Court has considered the entire record.  The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

      **A.**    **<u>Dr. Margaret Shields</u>** (Tr. 265-320, 389-405, 434-50, 632-66)

Between May 21, 2014, through June 21, 2018, Dr. Margaret Shields, DPM (doctor of podiatric medicine) treated Plaintiff's bilateral foot pain, secondary arthritis, and hereditary neuropathy.

On May 21, 2014, Plaintiff presented in Dr. Shields' office complaining of pain in both feet.  Plaintiff reported that he was born with club feet, and he had to wear braces as a child until he turned four.  Although Plaintiff has three pairs of custom-made orthotics, he reported not wearing the orthotics because wearing the orthotics resulted in increased foot pain.  Plaintiff explained that he wears tennis shoes for support, and his pain level exceeds 10/10 in both feet.  Plaintiff reported being a heavy smoker and taking Vicodin for his back pain.  Examination showed edema in both feet and severe pain with palpitation.  Dr. Shields found Plaintiff had bilateral foot degenerative joint disease, right foot displaced fracture, left foot arthrodesis, and club foot deformity of both feet.  Plaintiff declined a steroid injection, and Dr. Shields noted that she would discuss surgical options.  Dr. Shields wrapped Plaintiff's feet with ACE bandages and instructed him to remove the bandages at night and rewrap in the morning; to wear support shoes at all time; and to have his custom-made orthotics adjusted.

In follow-up treatment on June 12, 2014, Plaintiff reported that wearing the support shoes helped his foot pain and Vicodin also reduced his pain.  Dr. Shields discussed possible surgical options, gave Plaintiff a Tri-Lok ankle brace, and administered a corticosteroid injection.  During treatment on July 17, 2014, Plaintiff reported Percocet helping his back and foot pain, and he

would ask his primary care physician to refill his prescription.  Plaintiff indicated that the steroid injection reduced some of his pain but only for a week, and the Tri-Lok brace reduced left foot pain.  Plaintiff returned for a surgical consultation on August 28, 2014.  Plaintiff reported his left foot pain was minimally controlled by pain medicine, bracing, and steroid injections, and he elected to go forward with surgical correction of his left foot deformity.  Examination showed severe pain with palpitation of both feet.  Dr, Shields discussed Plaintiff's surgical procedures, including left foot Achilles tendon lengthening, removal of painful hardware in his left foot, and arthrodesis of joint in his left foot.

On September 8, 2014, Plaintiff returned for treatment after sustaining a fall post surgery.  Examination of Plaintiff's left foot showed his surgical site to be intact with no drainage or signs of infection.  Two weeks later, Plaintiff received surgical follow-up treatment, and he reported improved pain, taking Percocet every 4-6 hours as needed, and bearing no weight on his left foot.  Dr. Shields instructed Plaintiff to continue icing and elevating his left foot and replaced the splint with a fiberglass cast.

On October 6, 2014, Plaintiff reported improvement with his left foot pain and only taking pain medication twice a day and not needing a refill.  Examination showed Plaintiff's surgical sites healed.  On October 22, 2014, Plaintiff reported decreased pain in his left foot and continued elevation of his left foot several times a day.

On November 11, 2014, Plaintiff reported his pain had decreased to level 1/10.  When Plaintiff experienced throbbing pain, he would sometimes take pain medication but he had not taken any since running out of pain medications.  Examination showed decreased range of motion to mild pain of Plaintiff's left foot.  Dr. Shields instructed Plaintiff to start light weight bearing with his left foot only for standing and adding walking small distances.

During treatment on December 2, 2014, Plaintiff reported experiencing pain when wearing the long leg immobilizer boot because the boot caused additional pressure on his left foot due to the height difference between the boot and his right tennis shoe.  Plaintiff requested a referral to physical therapy.  Dr. Shields prescribed physical therapy twice a week and instructed Plaintiff to continue light weight bearing on his left foot with increased time increments.  On December 22, 2014, Plaintiff reported improvement from physical therapy and varied pain levels, ranging from 2/10 to 10/10.  Dr. Shields opined that Plaintiff's left foot pain stemmed from his joint healing.  Dr. Shields instructed Plaintiff to increase left foot weight bearing for longer periods of time.

Plaintiff returned on January 14, 2015, and reported taking Percocet every day for pain as needed, and his pain level was at level 4/10 in both feet.  Dr. Shields explained that it would take six months for his joint to heal and proposed treating his pain with a steroid injection during his next visit if his left foot pain persisted.  Dr. Shields instructed Plaintiff to continue physical therapy twice a week to strengthen his left foot muscles and to increase left foot weight bearing.  On February 2, 2015, Plaintiff reported that his left foot was feeling better until he injured his foot slipping in the shower that morning.  Plaintiff indicated that physical therapy had helped strengthen his left foot and alleviate his lower back pain.  Dr. Shields administered a steroid injection.

On February 23, 2015, Plaintiff reported no relief from the steroid injection, taking two to three Percocet tablets a day, and completing physical therapy.  Dr Shields explained that she might have missed the joint with steroid injection and administered another steroid injection and gave him an ankle brace to provide left ankle stability.  In follow-up treatment on March 16, 2015, Plaintiff reported that the steroid injection helped reduce his left ankle pain and the ankle

brace provided additional support.  Dr. Shields explained that Plaintiff needed a second surgery on his left foot prior to having surgery on his right foot and recommended that he continued wearing supportive shoes and an ankle brace on left foot, and either find his right foot ankle brace or ask for another brace.

Plaintiff returned on May 6, 2015, and reported continued left foot pain, doing physical therapy exercises at home, wearing a left foot brace, and taking Percocet two to three times a day.  On June 11, 2015, Plaintiff reported constant left foot pain and doing some physical therapy exercises periodically.  Dr. Shields recommended that Plaintiff have revisional left foot surgery prior to having right foot surgery, continue wearing supportive shoes, and wear a left foot ankle brace.

On October 9, 2015, Dr. Shields surgically removed Plaintiff's hardware and hammertoe, repaired his left foot joints, and lengthened his tendon.  After surgery, Dr. Shields recommended that Plaintiff use a walker or scooter for mobilization.  Plaintiff reported staying off his foot since surgery as directed, using a knee scooter for mobility, and keeping his foot elevated all day while he worked from home.  Dr. Shields instructed Plaintiff to continue non- weight bearing and ice and elevate his left foot.

In follow-up treatment on November 10, 2015, Plaintiff reported falling down getting out of his hot tub and thinking he might have broken two toes.  An x-ray showed hairline fractures of Plaintiff's toes, and Dr. Shields opined the fractures would heal without treatment since Plaintiff would be wearing a cast.  Dr. Shields refilled Plaintiff's Percocet prescription.  On December 10, 2015, Plaintiff reported feeling better and taking Percocet every 6-8 hours.  Dr. Shields found his toe fractures were almost healed, and she removed Plaintiff's cast and

instructed Plaintiff to start light weight bearing on his left foot wearing a boot and to continue icing and elevating his left foot 3-4x each day.

During treatment on December 23, 2015, Plaintiff admitted not icing his left foot and taking Percocet as needed for pain. Dr. Shields instructed Plaintiff to increase left foot weight bearing and to take Percocet as needed. On January 14, 2016, Plaintiff reported his left foot was doing okay and taking Percocet as needed. Dr. Shields found Plaintiff's fusion sites to be healing based on x-rays and prescribed physical therapy, instructed Plaintiff to transition from wearing a boot to supportive tennis shoes and to increase his activity. In follow-up treatment on February 12, 2016, Plaintiff reported his left foot was okay, elevating his foot in the evening, and taking Percocet as needed for pain. Dr. Shields found Plaintiff's joints did not fuse and directed Plaintiff to continue physical therapy and added additional physical therapy.

A May 19, 2016, x-ray showed an incomplete fusion midfoot on Plaintiff's left foot. An x-ray of his spine showed degenerative joint disease involving L4-L5 and L-5-S-1 on both sides.

On December 7, 2017, Plaintiff reported having severe pain in both feet and being able to stand somewhat comfortably for 15 to 20 minutes. Dr. Shields noted that Plaintiff had undergone surgery three times on his left clubfoot, resulting in improvement of the alignment of his lower left extremity but not relieving his pain. Plaintiff indicated that he was concerned about the hardware in his left foot because of a popping feeling. Based on a review Plaintiff's x-rays, Dr. Shields recommended surgical removal of his left foot hardware and then six months later, revision of joint fusion, or more conservative treatment including continuing steroid injections and medication regimen, wearing and replacing supportive tennis shoes every three months, wearing left foot brace every day, and recommending Plaintiff see a pain management specialist for other options. Based on a review of Plaintiff's right foot x-rays, Dr. Shields

recommended triple arthrodesis surgery with bone graft and tendon lengthening or more conservative treatment, including continuing steroid injections and medication regimen, wearing and replacing supportive tennis shoes every three months, wearing brace every day, making Plaintiff a new pair of custom orthotics, and recommending Plaintiff see a pain management specialist for other options.  Dr. Shields further opined that she believed Plaintiff to be a candidate for disability because of the severity of the deformities in his feet, his hereditary neuropathy in both feet, and the long-term effects his feet had caused to his knees and lower back.

During treatment on June 21, 2018, Plaintiff reported severe bilateral foot pain and considering surgery "down the road" on his feet but family commitments prevented him from having surgery at that time.  An x-ray of Plaintiff's left foot showed no changes from December 2017.  Dr. Shields explained that Plaintiff's increased left foot pain was probably caused by his hardware moving and recommended surgically removing the hardware and considering a new pair of custom made orthotics.

**B.**   **Physicians Pain Services - Dr. Michael Boedfield** (Tr. 321-28)

On August 2, 2016, Plaintiff presented for treatment of low back pain and bilateral foot pain with Dr. Michael Boedfield.

An MRI of Plaintiff's lumbar spine showed degenerative changes from L1-2 through L5-S1, mild stenosis, lateral recess stenosis from L1-2 through L4-5, and neural stenosis at L3-4 on the left and L-4 on the right.

On September 9, 2016, Dr. Boedfield found Plaintiff had intervertebral disc displacement, intervertebral disc degeneration and unspecified foot and ankle pain based on MRI

results and examination.   As treatment for Plaintiff's intervertebral disc displacement, Dr. Boedfield prescribed Grasile tablets and scheduled Plaintiff for epidural steroid injections.

  **B.**  <u>**Esse Health - Dr. Jennifer Sewing and Lisa Schutz, FNP**</u> (Tr. 329-425, 559-608)

  Between February 18, 2015, and June 27, 2017**,** Dr. Jennifer Sewing and Lisa Schutz, FNP ("NP Schutz"), treated Plaintiff's chronic foot and lower back pain.

  On February 18, 2015, NP Schutz continued Plaintiff's current pain management regimen of Oxycodone and Soma, and she discussed referring Plaintiff to a pain management specialist. NP Schutz noted that Plaintiff did not get an MRI completed as previously recommended, and she once again recommended an MRI.  Plaintiff reported stressors of family member moving into his house with bipolar, recently moving to a lake house, and having two root canals.  NP Schutz found Plaintiff had no improvement of his congenital club foot after left foot corrective surgery on September 4, 2015.   NP Schutz encouraged Plaintiff to diet and exercise as tolerated, and to lose weight.

  On May 12, 2015, Dr. Sewing administered a steroid joint injection.

  In follow-up treatment on July 6, 2015, Plaintiff complained of pain in his right side, symptomatic for several months.  Plaintiff reported travelling to Cuba and questioning whether he  had acquired an abdominal bug.  Plaintiff indicated that he takes several pain management medications due to a clubbed foot but when he was visiting New York City, he walked "20 miles per day" wearing his new shoes. (Tr. 342)  A CT of Plaintiff's abdomen showed a normal appendix.

  Plaintiff returned on May14, 2016, and reported having a repeat surgery on his left foot in October, 2015, and recovering well.

On May 24, 2016, Plaintiff complained of persistent foot pain since his most recent foot surgery and low back pain.  Plaintiff reported that he started tracking his food intake and exercising.  Dr. Sewing praised Plaintiff for making dietary changes to help his morbid obesity.

On February 9, 2017, Dr. Sewing encouraged Plaintiff to lose weight with increased activity and ordered physical therapy to address his back pain.  In follow-up treatment on June 27, 2017, Plaintiff reported right shoulder, left foot, and right knee pain.  Plaintiff explained that he was unwilling to see pain management specialist because he did not like previous specialist.

**D.**      **SSM Healthcare and SSM  Physical Therapy** (Tr.426-72, 491-557, 572-81)

Between December 1, 2015 and February 13, 2018, a number of doctors and therapists treated Plaintiff at SSM Healthcare and SSM Physical Therapy.

On December 1, 2015, Dr**.** Hari Srihari treated Plaintiff's mild coronary disease.

On October 9, 2015, Plaintiff presented for outpatient surgery for removal of painful hammertoe, hardware, fusion, and arthrodesis performed by Dr. Shields

On September 20, 2016, after being worked up for a surgical procedure, Plaintiff decided he did not want to have the procedure after hearing the discharge instructions precluding him from not being able to soak in water for 48 hours.  Plaintiff indicated that he did not want to go that long without using his hot tub.

On December 6, 2016, Dr. Srihari found Plaintiff remained stable from a cardiovascular standpoint and recommended aerobic exercise as tolerated.

On November 28, 2017, Plaintiff started  physical therapy three times a week, for six weeks, after rotator cuff replacement surgery to improve his range of motion.  Plaintiff reported a long history of shoulder pain with a current pain level at 2/10.  Plaintiff noticed increased pain

while operating a chainsaw.  Plaintiff reported being unable to wash his back and perform recreational activities.  After twelve sessions, the therapist noted that Plaintiff had responded well to physical therapy with significantly increased range of motion in all directions but he still had difficulty unloading the dishwasher.

During treatment on January 16, 2018, Plaintiff reported improvement and doing well with occasional twinges of pain with a 0/10 pain level.  On January 18, 2018, Plaintiff reported being unable to lift his arm after making dinner.  On January 23, 2018, Plaintiff reported being able to lift a gallon of milk without pain and waking up in the morning without pain.  In a January 23, 2018, treatment note, the therapist found that had responded well to physical therapy with increased strength and range of motion in all directions.  The therapist provided Plaintiff with a home exercise program.  During treatment on February 13, 2018, Plaintiff reported going on vacation and being able to play golf every day without experiencing shoulder pain.  The therapist discharged Plaintiff from treatment, finding that Plaintiff had met the physical therapy treatment goals, and his shoulder strength had significantly increased with all resisted testing.

In follow-up treatment on December 22, 2017, Dr. Srihari found Plaintiff's hypertension to be well controlled and his cardiovascular to be stable, and recommended diet and exercise as tolerated.

### E.  SSM Neurosciences South - Dr. Laurence Kinsella (Tr.480-85, 609-12)

On October 27, 2016, Dr. Laurence Kinsella completed a neuropathy consultation. Plaintiff reported that his foot pain was so bad he had to wear supportive shoes, and he had "15 years of easily compressible nerves, especially when working on his showcase mustang."  (Tr. 480)  Based on nerve conduction studies and his examination, Dr. Kinsella found Plaintiff had probable hereditary neuropathy and clubfoot.

11

In follow-up treatment on February 13, 2017, Dr. Kinsella recommended HNPP assay, physical therapy, vigorous daily exercise, right rotator cuff injections, and a follow-up visit in six months.  Since his last visit, Plaintiff reported having sciatica pain and cramping in his legs.

### F.       Paterson Family Practice – Dr. Michael Patterson (Tr. 613-30)

On March 29, 2018, Plaintiff established care at Paterson Family Practice with Dr. Michael Patterson.  Plaintiff reported having severe foot pain in both feet for over five years and having success with medication.   Plaintiff indicated that he had applied for disability. Examination showed his gait affected by a limp while walking and instability, normal strength and full range of motion in all major muscle groups and joints, and bilateral lumbar paraspinous muscle tenderness.   Dr. Patterson ordered numerous drug screenings and refilled Plaintiff's Oxycodone prescription.  On the registration form, Plaintiff listed "Retired" as his employer's name.

### G.       Premier Care Orthopedics and Sports Medicine – Dr. Randall Otto and PA Aaron Sulak (Tr. 592-601, 668-728)

On July 14, 2017, Plaintiff presented for treatment for bilateral shoulder pain.  Dr. Randall Otto injected Plaintiff's right shoulder into the subacromial space.  Plaintiff returned on August 18, 2017, and reported significant improvement after injection but the pain returned. Based on his examination, Dr. Otto ordered further diagnostic evaluations of Plaintiff's right shoulder after failed conservative treatment.

An August 23, 2017, MRI showed tears in Plaintiff's right shoulder rotator cuff.  In a follow-up visit on August 25, 2017, Plaintiff reported experiencing a lot of pain.  Dr. Otto recommended surgical repair.

On October 2, 2017, Dr. Otto surgically repaired Plaintiff's right shoulder rotator cuff tear and biceps partial tear.  Plaintiff reported several of his jobs required him to work on a computer several hours a day, contributing to his pain.

On October 17, 2017, Dr. Otto evaluated Plaintiff two weeks post right shoulder rotator cuff repair surgery.  Plaintiff reported doing well and his pain was well controlled.  Dr. Otto instructed Plaintiff to continue wearing brace and doing exercises.  Plaintiff returned on November 17, 2017; Dr. Otto prescribed physical therapy.

On December 22, 2017, Plaintiff reported being able to use his laptop and attending physical therapy.  PA Aaron Sulak found Plaintiff doing fairly well and gradually progressing with his range of motion.  Plaintiff returned on February 2, 2018, and reported that his range of motion had improved and denied any night pain.

On April 6, 2018, Plaintiff returned for a routine evaluation six months status post right shoulder arthroscopic rotator cuff repair and limited joint debridement.  PA Sulak released Plaintiff to gradually increase his activities as tolerated.  Plaintiff reported doing well overall and not currently having any pain.  PA Sulak found that Plaintiff could continue to progressively increase his activity as tolerated, and Plaintiff should return on an as needed basis.

### III.  **Opinion Evidence**

#### A.  **Function, Disability, and Work History Reports** (Tr. 197-243)

In a Disability Report – Adult, Plaintiff indicated that he stopped working on December 4, 2015, because he was laid off due to a merger.

In a Function Report - Adult, Plaintiff stated that his daily activities include going to his basement to listen to music or watch television, preparing dinner, and sitting in the living room with his wife after dinner.  Plaintiff indicated that his hobbies and interests include listening to

music, and watching movies and car shows, and he does these activities daily and very well. Plaintiff's social activities include attending car club events, visiting parents and children, going to the lake with friends, and social media.

### B.  Physician's Assessment for Disability Claim - Dr. Shields (Tr. 659-60)

On July 12, 2018, Dr. Shields completed a Physician's Assessment for Disability Claim ("Assessment") and listed deformity of bilateral feet (club feet), hereditary and idiopathic neuropathy of bilateral feet, as her diagnoses.  Dr. Shields opined as follows regarding Plaintiff's severity of his corrected congenital clubfeet from childhood:

> deformity remained in both feet and secondary arthritis at a younger age.  The poor alignment of his feet have accelerated early degeneration of his knee joints and lower back as well.  All conservative treatment options listed below will only minimally decrease [Plaintiff's] foot pain and only for short periods of time.  He cannot stand on his feet for more than 15-20 minutes without developing severe shooting pain.  If he is moving, he can be on his feet up to 45 minutes before he has severe shooting pains.  Long term, [Plaintiff] may be wheel chair bound.

(Tr. 659)

Dr. Shields' recommended conservative treatment including sturdy, supportive tennis shoes and foot/ankle braces, taking oral Zorvolex and Percocet or other pain medication as prescribed by a pain management physician, and minimizing the time spent standing on his feet. Dr. Shields opined that future surgery may help reduce some of Plaintiff's foot pain but would require 3-6 months of non-weight bearing to the lower extremity and such limitation would "catastrophically affect [Plaintiff's] ability to function properly at a full-time job whether sitting or mobile."  (Tr. 657)  Dr. Shields explained that, although Plaintiff had three surgeries on his left foot to fuse joints and correct the position of his left foot, most of the joints failed the fusion process because of congenital poor quality of bone, hereditary neuropathy, and arthritic degeneration of the joints.  Dr. Shields further opined that "[d]ue to the severity of [Plaintiff's]

14

deformed club feet, hereditary neuropathy and secondary arthritis, the pain in his feet that he experiences daily to perform simple tasks is restricting and limiting itself." (Id.) Dr. Shields opined that there are both conservative and surgical treatment options available to Plaintiff which would not result in permanent disability but would require three to six months recovery time.

Dr. Shields indicated that Plaintiff's impairments would limit his ability to stand for more than 15-20 minutes without severe pain and to move 45 minutes to one hour due to pain, instability and balance issues, and he would have to rest his feet every hour. Dr. Shields opined that Plaintiff cannot sit for extended periods due to his neuropathy and foot deformity, and he is at risk when going from seated to standing due to instability. Lastly, Dr. Shields further opined that Plaintiff could not perform a sedentary job because sitting would cause further muscle weakness in both of his lower extremities.

## IV.    The Hearing Before the ALJ

The ALJ conducted a hearing on July 24, 2018. Plaintiff was present with an attorney and testified at the hearing. The VE also testified at the hearing. (Tr. 35-85)

### A.    Plaintiff's Testimony

Plaintiff began his testimony by noting that he lives with his wife. (Tr. 45) Plaintiff has graduated from high school, completed vocational training in IT support and web development, and obtained a number of IT certifications from Microsoft. (Tr. 40, 46) Plaintiff testified that he drives to shop for household items. (Tr. 64)

Since 1998, Plaintiff has worked in the IT area. (Tr. 46) Plaintiff testified that he last worked in a call center for thirty days but the job required Plaintiff to sit at a desk for four hour increments without a break, and he could not do so. (Tr. 46) Plaintiff testified that he worked as a phone support administrator until December 4, 2015. (Tr. 49) In that position, Plaintiff was

15

able to get up and walk around while wearing a wireless headset.  His employer accommodated Plaintiff through both foot surgeries.  (Tr. 50)  After surgery in October 2015, Plaintiff did not work for two weeks and then his boss dropped off a computer at his house so he could work an hour or two a day before he returned to the office part time.  Plaintiff testified that he was non-weight bearing when he returned to work, and he used a knee scooter to get around work. Plaintiff was laid off on December 4, 2015.  (Tr. 50)

Plaintiff testified that he has had three joint fusion surgeries on his left foot without much success because of his hereditary neuropathy with pressure palsy ("HNPP") and some of the hardware has broken loose.  (Tr. 51)  Plaintiff explained that he hoped to have surgery to remove the hardware.  (Tr. 52)  Plaintiff's HNPP contributes to the problems with his feet and his body such as no feeling in his hands and sudden momentary, debilitating pain in his knees.  (Tr. 53) Plaintiff testified that his constant foot pain has increased so he elevates his feet every night after dinner.  (Tr. 54)

Plaintiff testified that he can comfortably sit for fifteen to twenty minutes, and he has problems rising from a seated position related to his feet.  (Tr. 54)  Plaintiff explained he wore corrective braces on his feet from infancy until age four.  (Tr. 54).  Plaintiff can no longer play the guitar, because his fingers no longer feel the strings.  (Tr. 55)  Plaintiff testified that his lower back hurts all the time, and Dr. Boedfield provided pain management.  (Tr. 56)  Plaintiff takes multiple medications as treatment and does stretching exercises provided by his physical therapist.  Plaintiff has received injections in his feet, knees, and back but the injections would only reduce his pain for two days.  (Tr. 56)  Plaintiff also experiences depressive episodes twice a month.  (Tr. 57)  Plaintiff had right shoulder rotator cuff surgery.  (Tr. 59)

In a typical day, Plaintiff testified that he uses a hot tub multiple times for twenty minutes and listens to music in his studio.  (Tr. 58)  Plaintiff cuts the grass using a riding mower.  (Tr. 59)  Plaintiff testified that he can do all household chores except vacuuming.  (Tr. 60)  Plaintiff is an active member of a 600-person car club.  (Tr. 62)  After building the club's website, Plaintiff is in charge of running the club's national website and Facebook page.  (Tr. 62-63)  Plaintiff owns a 2006 Mustang show car and cleans the car by wiping it down.  Plaintiff testified that when he does a lot of walking, he experiences knee pain, and he has problems negotiating steps. (Tr. 64)  After Christmas, Plaintiff and his wife purchased bicycles, and he rides his bike on a big hill close to their house with his wife.  (Tr. 65)  Plaintiff testified that while visiting his parents, he rode a total of eighteen miles in seven days.  (Tr. 66)  Plaintiff explained that bike riding stretches his lower back.  (Tr. 67)

### B.   The VE's Testimony

The VE identified Plaintiff's past work as a webmaster, a help desk technician, and a user support analyst, all sedentary, skilled jobs.  (Tr. 69-74)

The ALJ asked the VE a series of hypothetical questions to determine whether someone Plaintiff's age, education, work experience, and specific functional limitations would be able to find a job in the local or national economy.  (Tr. 74)  First, the ALJ asked  the VE to assume a hypothetical individual limited to sedentary work with a sit/stand option allowing the individual to stand for five minutes two times an hour while remaining at the workstation; handling and fingering frequently bilaterally; no climbing ladders, ropes, or scaffolds; no balancing, kneeling, or crawling; climbing ramps and stairs occasionally, and stooping and crouching occasionally; and no exposure to unprotected heights or concentrated vibration or hazardous machinery or moving mechanical parts.  (Tr. 75)  The VE responded that such a hypothetical person would be

able to perform all of Plaintiff's past work as long as he remains on task.  The ALJ next asked if the individual had an additional restriction of occasional contact with coworkers, supervisors, and the general public, could the individual perform Plaintiff's past relevant work.  The VE responded such individual could not perform Plaintiff's past relevant work because the restriction would require more than occasional contact.  (Tr. 75)

Counsel asked if the handling and fingering restriction was changed to occasional bilaterally, would the individual be able to perform Plaintiff's past relevant work.  (Tr. 77)  The VE indicated that the individual would not be able to perform the duties of Plaintiff's past relevant work.

Next, the ALJ inquired into Plaintiff's use of a chainsaw, going on vacation, and playing golf during the relevant time period. (Tr. 78-79)  Plaintiff indicated that he has not touched a chainsaw since he injured his shoulder in March 2017, and he can only play three holes of golf using a golf cart.  (Tr. 79)  Plaintiff testified that when he visits his parents, he will go out on the golf course and play three holes of golf.  (Tr. 80)  Plaintiff goes out to the driving range and hits balls for thirty minutes.  (Tr. 81)  In response to ALJ's inquiry about gripping a golf club, Plaintiff stated that "the grip on a golf club is supposed to be very light, like you're holding a wet washcloth."  (Tr. 82)  Plaintiff explained that he cannot feel light weight objects, and he has no problem brushing his teeth.  (Tr. 82-83)

## V.   The ALJ's Decision

In a decision dated October 24, 2018, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  (Tr. 18-30)  The ALJ determined that Plaintiff had severe impairments of degenerative disc disease, osteoarthritis, congenital clubfeet with multiple surgeries, hereditary neuropathy with pressure palsy, and morbid obesity.  (Tr. 23-25) The ALJ determined that Plaintiff had a residual functional capacity ("RFC") to perform sedentary work

18

with the following modifications:  (1) he has a sit/stand option allowing a change in position, standing for five minutes two times an hour, while remaining on task at the workstation; (2) he is limited to frequent handling and fingering bilaterally; (3) he can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; (4) he can never balance, kneel, or crawl, and occasionally stoop or crouch; and (5) he can never work at unprotected heights or near moving mechanical parts, and only occasionally be exposed to vibration.  (Tr. 26-29)

The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [of his medically determinable impairments] are not entirely consistent with the medical evidence and other evidence in the record…." (Tr. 27)  Regarding Plaintiff's obesity, the ALJ found that Plaintiff's "has a history of obesity that predates the period of disability" and during the hearing, Plaintiff "did not complain of any problems associated with his weight." (Tr. 27)

The ALJ specifically considered state agency psychiatrist Dr. Brandhorst 's opinion that Plaintiff's depression was not severe.  (Tr. 28)  The ALJ accorded this opinion great weight because the opinion is consistent with the record as a whole and Plaintiff's hearing testimony. The ALJ gave some weight to the opinion of Dr. Smith, a state agency medical consultant, who opined that Plaintiff is limited to the light exertional level, with occasional ramps, stairs, balancing, stooping, kneeling, crouching, and crawling; never using ladders, ropes, or scaffolds; and avoiding concentrated exposure to cold, heat, vibration, and hazards, some weight.  (Tr. 28) The ALJ explained that, although Dr. Smith's opinions were generally consistent with the medical records at the time of his decision, his opinions do not reflect Plaintiff's current condition as impacted by the cumulative effect of his ongoing and worsening pain as evidenced by his later medical records.  (Tr. 28-29)  The ALJ noted that the sedentary exertional level, the sit/stand

option, and the postural limitations included in the RFC better reflect the recommendations of Plaintiff's doctors and his hearing testimony about his capabilities.  (Tr. 29)  Thus, the ALJ found greater restrictions than those offered by Dr. Smith.

The ALJ assigned some weight to Dr. Shields' October 2015 post-operative opinions regarding Plaintiff's continued use of a walker or a scooter and elevation of his left foot after surgery. (Tr. 29)   The ALJ opined that these limitations were post-operative limitations contemporaneous to Plaintiff's post-operative recovery period and not long term restrictions. With respect to Dr. Shields' Assessment, the ALJ assigned these opinions partial weight.  In particular, Dr. Shields opined that Plaintiff cannot stand on his feet for more than fifteen to twenty minutes without experiencing severe pain; walk for more than forty-five minutes without experiencing severe pain; sit for an extended periods due to his neuropathy and foot deformity; and rising from a seated to standing position due to instability and balance problems**.**  The ALJ assigned great weight to Dr. Shields' opinion regarding the possibility of medical improvement from both surgical and conservative treatment options with a three to six month recovery time available to Plaintiff that would not result in permanent disability.  The ALJ also assigned great weight to Dr. Shields' standing and walking restrictions and limited weight to her sitting restriction.  (Tr. 29)

The ALJ identified that Plaintiff's past relevant work as a help desk technician, a user support analyst, and a webmaster.  (Tr. 29)  The ALJ found, based on the VE's testimony, that the help desk technician and user support analyst jobs were classified as a computer user support specialist with an exertional level of sedentary, and the webmaster job as performed by Plaintiff had an exertional level of sedentary.  (Tr. 19)  Therefore, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act.  (Tr. 30)

The ALJ's decision is discussed in greater detail below in the context of the issue Plaintiff has raised in this matter.

## VI. **Standard of Review and Legal Framework**

"To be eligible for … benefits, [Plaintiff] must prove that [he] is disabled …." <u>Baker v. Sec'y of Health and Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992); <u>see also</u> <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A plaintiff will be found to have a disability "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [her] previous work but cannot, considering [his] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B). <u>See also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether: (1) the claimant was employed; (2) [he] was severely impaired; (3) [his] impairment was, or was comparable to, a listed impairment; (4) [he] could perform past relevant work; and if not, (5) whether [he] could perform any other kind of work." <u>Martise v. Astrue</u>, 641 F.3d 909, 921 (8th Cir. 2011) (quoting <u>Halverson v. Astrue</u>, 600 F.3d 922, 929 (8th Cir. 2010)). <u>See also</u> <u>Bowen</u>, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole.  See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).  Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.  Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The claimant's vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the claimant's impairments.
6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549,

556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## VII.  Analysis of Issue Presented

In this action, the ALJ considered all of the opinion evidence of record and accorded varying weights to the medical opinions.  Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ improperly evaluated Dr. Shields' opinion evidence and accorded only partial weight to Dr. Shields' opinion evidence in her Assessment.

When evaluating opinion evidence, the ALJ is required to explain in her decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources.  See 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(II).  The Regulations require that more weight be given to the opinions of treating physicians than other sources.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  Id.; see also Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004).  Greater weight is given to the treating physician's opinion because the treating physician has the best opportunity to observe and evaluate a claimant's condition, and "likely to be the medical professional most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot

be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ assigned some weight to Dr. Shields' October 2015 post-operative opinions regarding Plaintiff's continued use of a walker or a scooter and elevation of his left foot after surgery.  Because the ALJ opined these limitations were contemporaneous to Plaintiff's post-operative recovery period and not long term restrictions.  With respect to Dr. Shields' Assessment, the ALJ assigned these opinions partial weight.  In particular, Dr. Shields opined that Plaintiff cannot stand on his feet for more than fifteen to twenty minutes without experiencing severe pain; walk for more than forty-five minutes without experiencing severe pain; sit for an extended periods due to his neuropathy and foot deformity; and rising from a seated to standing position due to instability and balance problems.  The ALJ assigned great weight to Dr. Shields' opinion regarding the possibility of medical improvement from both surgical and conservative treatment options with a three to six month recovery time available to Plaintiff that would not result in permanent disability.  The ALJ also assigned great weight to Dr. Shields' standing and walking restrictions and limited weight to her sitting restriction.

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord that and any other medical opinion of record, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,  whether the physician provides support for her findings, and the physician's area of specialty.  20 C.F.R. §§ 404.1527(c), 416.927(c).  Inconsistency with other substantial evidence alone is a sufficient basis upon which an ALJ may discount a treating physician's opinion.  Goff, 421 F.3d at 790-91.  The

Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In addition, a medical source's opinion that an applicant is unable to work involves an issue reserved for the Commissioner and is not the type of opinion that the Commissioner must credit. Ellis v. Barnhart, 392 F.3d 988, 994-95 (8th Cir. 2005).

Dr. Shields was Plaintiff's treating physician and first treated Plaintiff on May 21, 2014, and last treated him on June 21, 2018.  Between June 11, 2015, and February 12, 2016, Dr. Shields treated Plaintiff monthly but thereafter, between February 12, 2016, and June 21, 2018, Dr. Shields treated Plaintiff every six months.  Because Dr. Shields' opinion evidence, which essentially found that Plaintiff was unable to engage in most work-related functions, is inconsistent with her own treatment notes and objective evidence, the ALJ did not err in discounting Dr. Shields' opinion evidence.  Goff, 421 F.3d at 791.  See also Cline v. Colvin, 771 F.3d 1098, 1103 (8th Cir. 2014) (ALJ gave little weight to treating physician's opinion that was inconsistent with treatment records and objective medical evidence, and not supported by physicians own exams and test results, thereby undermining the credibility of such opinions).  Indeed, nowhere in her treatment notes did Dr. Shields record any observations or findings consistent with the limitations she included in her opinion evidence. Nor did Dr. Shields impose any of the functional limitations, such as an inability to sit for an extended period of time, during her treatment of Plaintiff.  See Fischer v. Barnhart, 56 F. App'x 746, 748 (8th Cir. 2003) ("in  discounting [the treating physician's] opinion, the ALJ properly noted that ... [the treating  physician] had never recommended any work restrictions for [the claimant]").  The ALJ did not err when she discounted Plaintiff's treating physician's opinion evidence where the limitations listed in the statement stand alone and were never

25

mentioned in the physician's numerous records of treatment.  Cline, 771 F.3d at 1104.

While the evidence of record shows that Plaintiff experienced limitations due to his club feet, hereditary neuropathy and secondary arthritis, substantial evidence supports the ALJ's conclusion that the limitations were not as severe as opined by Dr. Shields.  Despite his longstanding medical conditions since he was a child, the record shows Plaintiff completed high school and vocational training in IT support and web development.  Furthermore, Plaintiff had a good work record despite his longstanding medical conditions and stopped working in December 2015 when he as laid off from his job.  The Eighth Circuit has found it significant when a claimant leaves work for reasons other than disability.  Goff, 421 F.3d at 792-93 (claimant stopped working after being fired, not because of her disability); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir.  2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find  that this suggested that his impairments were not as severe as he alleged); Weber v. Barnhart,  348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her job due to lack of transportation, not due to disability).  His job duties included walking for one to two hours, sitting for one to eight hours, and writing, typing, and handling small objects for six to eight hours in a workday.  Plaintiff's ability to work for many years with the same or similar impairments weighs against his allegations of disabling symptoms.  See Goff v. Barnhart, 421 F.3d 785, 792-93 (8th Cir. 2005) ("The fact that Plaintiff worked for over three years after her strokes, coupled with the absence of evidence showing any deterioration in her condition, demonstrates that her condition is not disabling.").  And, indeed, Plaintiff successfully engaged in activities requiring such abilities such as sitting for an extended period of time, including traveling to Cuba, New York and walking twenty miles a day for five days, and Texas and riding his bike for a total of eighteen miles in a week, going

26

on vacation and playing golf every day, playing three holes of golf while visiting his parents, going to the driving range and hitting balls for thirty minutes, riding a bike, attending car shows, visiting friends at the lake, and spending several hours playing video games or using the computer.  Julin v. Colvin, 826 F.3d 1082, 1088 (8th Cir. 2016) (finding inconsistencies between a plaintiff's subjective complaints and her daily living pattern raised doubts about her claim).  Likewise, in a function report, Plaintiff stated that his daily activities include watching television and sitting in the living room with his wife after dinner.  The objective record shows that Plaintiff engaged in a wide range of daily activities showing that he was physically capable of performing sedentary work including sitting for an extended period of time.

A review of the ALJ's decision shows that that ALJ thoroughly reviewed all of the evidence of record, including treatment notes and opinion evidence from Plaintiff's treating physicians, his subjective claims, and hearing testimony.  The ALJ specifically noted Dr. Shields' opinion evidence regarding Plaintiff's inability to sit for an extended period of time was inconsistent with the objective evidence of record that demonstrated Plaintiff's ability to previously work at a job requiring him to sit from one to eight hours a day, to travel to Cuba, New York, and Texas, to ride a bike eighteen miles in one week, to play video games or to use the computer for several hours, and to ride a bike.  A review of the record in toto shows there to be substantial evidence that Plaintiff was not as limited as opined by Dr. Shields.[2]  The ALJ did not err in according partial weight to Dr. Shields' opinion evidence regarding sitting.  Because the ALJ's reasons to discount Dr. Shields' opinion evidence are supported by substantial evidence on the record as a whole, the ALJ did not err in according only limited weight to her opinion

---

[2] Although Plaintiff testified he could only sit for fifteen to twenty minutes, the hearing transcript reflects that Plaintiff was able to sit during the hour plus hearing.  (Tr. 35-85)

evidence.  Julin, 826 F.3d at 1088 (opinions of treating physicians may be given limited weight if they are inconsistent with the record.).

The ALJ's determination  of Plaintiff's physical RFC is based upon a thorough review of the record as a whole.  The RFC is consistent with substantial medical evidence of record and other objective evidence.  That being said, a review of the ALJ's RFC assessment shows it to contain significant functional limitations, including sedentary exertional level, the sit/stand option, limited to frequent handling and fingering bilaterally, and postural limitation.  Such limitations are consistent with many of the limitations described by Dr. Shields.  The ALJ therefore did not wholly fail to consider Dr. Shields' opinion evidence and the RFC assessment is supported by some medical evidence.  An ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." Martise, 641 F.3d at 927.  Instead, the ALJ must determine a plaintiff's RFC based on her review of the record as a whole as the ALJ did in this case.

**VIII.   Conclusion**

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).  "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion.  Id.  Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Id.; see also Igo v. Colvin, 839 F.3d 724, 728 (8th Cir. 2016).  For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the

record as a whole.  See Finch, 547 F.3d at 935.  Similarly, the Court cannot say that the ALJ's

determinations in this regard fall outside the available "zone of choice," defined by the record in

this case.  See Buckner, 646 F.3d at 556.  For the reasons set forth above, the Commissioner's

decision denying benefits is affirmed.  Accordingly,

       **IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.

    A separate Judgment shall accompany this Memorandum and Order.

                      /s/ *John M. Bodenhausen*
                      JOHN M. BODENHAUSEN
                      UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of August, 2020.